UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FMS, INC., a Maine corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 00 C 8143 |
| | ) | |
| VOLVO CONSTRUCTION EQUIPMENT | ) | |
| NORTH AMERICA, INC., a Delaware | ) | |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Charles P. Kocoras, District Judge:

This matter comes before the court on several post-trial motions of the parties.

Defendant Volvo Construction Equipment North America, Inc. ("Volvo") moves for

judgment as a matter of law or, in the alternative, for a new trial or remittitur.

Plaintiff FMS, Inc. ("FMS") requests prejudgment interest, taxable costs, and

attorneys' fees.  For the reasons set forth below, Volvo's motion is denied.  FMS's

motions for prejudgment interest and attorneys' fees are denied.  Its motion for

taxable costs is granted in part and denied in part.

## BACKGROUND

From 1997 to late 1999, Plaintiff FMS, Inc. ("FMS") purchased and sold

excavators pursuant to a dealer agreement with Samsung Construction Equipment

North America Corp. ("Samsung"). FMS sold these Samsung excavators with attachments, manufactured by other suppliers, designed for use in the forestry industry in Northern Maine. In 1998, Volvo acquired Samsung and assumed its contractual obligations. In 1999, Volvo informed FMS of its decision to discontinue the Samsung excavator line and terminate the dealer agreement. Volvo did not stop making excavators, however; it continued to manufacture an excavator based upon the Samsung platform and to sell those excavators under the Volvo brand through another dealership in Maine.

In 2000, FMS, along with several other former dealers of Samsung excavators, sued Volvo for wrongful termination of their dealer agreements. This Court granted summary judgment in favor of Volvo on all claims. On appeal, the Seventh Circuit reversed our decision in part, holding that the protections of the Maine Franchise Law, 10 Me. Rev. Stat. § 1361 *et seq*. ("MFL") applied to trump termination provisions in FMS's dealer agreement. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 391 (7th Cir. 2003). The MFL provides that a dealer may not terminate a franchise relationship unless it has good cause for the termination. §1363(C). Good cause for termination exists when the manufacturer discontinues the production or distribution of the franchise goods. § 1363(C)(2)(4). The Seventh Circuit held that a disputed issue of fact existed with respect to whether or not Volvo

had "good cause" to terminate FMS's Samsung Dealer Agreement as required by the MFL, and remanded the case for trial. The case was tried to a jury, which returned a $2.1 million verdict in favor of FMS on November 30, 2006. By special verdict form, the jury indicated that it attributed 50 percent of the damages to lost profits from the sales of attachments sold with the Samsung excavators.

Volvo now moves for judgment as a matter or law or, in the alternative, a new trial or remittitur, arguing that (1) the jury's verdict was unsupported by the evidence; (2) the jury was erroneously instructed as to the meaning of the MFL; (3) the testimony of FMS's damages expert concerning FMS's lost profits was unreliable under the *Daubert* standard and impermissibly speculative; and (4) the amount of the damages award should be reduced by 50 percent because the MFL does not permit recovery for lost sales attributable to goods not manufactured by Volvo.

FMS, as the prevailing party, moves for an award of taxable costs, prejudgment interest on the verdict, and attorneys' fees incurred since the Seventh Circuit remanded the case.

## LEGAL STANDARDS

### A. Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial or Remittitur

Fed. R. Civ. P. 50(a)(1) and 59(a) supply the guidelines for evaluating Volvo's motion. Federal courts sitting in diversity apply the federal standard to motions for

a new trial, remittitur, and judgment as a matter of law, although state law supplies the elements of proof for the substantive legal issues. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) (new trial); *Lane v. Hardee's Food Systems, Inc.*, 184 F.3d 705, 707 (7th Cir. 1999) (judgment as a matter of law); *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554 (7th Cir. 1990) (excessive verdict).

Rule 50(a) permits a court to enter judgment as a matter of law against a party with respect to any issue on which the party has been fully heard if there is "no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Rule 50 imposes a "high standard for overturning a jury verdict." *Pierson v. Hartley*, 391 F.3d 898, 903 (7th Cir. 2004). Judgment as a matter of law is not appropriate unless, after drawing inferences from the evidence in the light most favorable to the party against whom the motion is directed, the court determines that no reasonable jury could have found in favor of that party. *Mangren Research and Development Corp. v. National Chemical Co., Inc.*, 87 F.3d 937, 941 (7th Cir. 1996).

Rule 59(a) permits a court to grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." In practical terms, this means that a new trial should be granted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Davis v. Wisconsin Dept. of Corrections*, 445 F.3d 971, 979 (7th Cir. 2006). A new

trial may be ordered when the court erred in admitting evidence such that a party's substantial rights were violated, *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 -9 (7th Cir. 2006); when the jury was confused or misled because the jury instructions did not adequately state the law, *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries,* 272 F.3d 441, 452 (7th Cir. 2001); when the jury's verdict was against the manifest weight of the evidence, *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006); or when the damages awarded were "monstrously excessive" or lacking rational connection to the evidence. *Holmes v. Elgin, Joliet & Eastern Ry. Co.,* 18 F.3d 1393, 1395 (7th Cir. 1994). The decision to order a new trial is within the sound discretion of the trial court. *Kempner Mobile Electronics, Inc. v. Southwestern Bell Mobile Systems*, 428 F.3d 706, 716 (7th Cir. 2005).

## B. Motion for Taxable Costs

Federal Rule of Civil Procedure 54(d)(1) allows a court to tax costs other than attorneys' fees in favor of a prevailing party. Pursuant to 28 U.S.C. § 1920, recoverable costs include: (1) fees of the clerk, (2) fees for transcripts, (3) fees for printing and witnesses, (4) fees for copies of papers necessarily obtained for use in the case, (5) docket fees, and (6) compensation for court-appointed experts and interpreters. A prevailing party enjoys the presumption that costs will be awarded. *See M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409-10 (7th Cir. 1991). This presumption is difficult for the losing party to overcome, and a court must award

costs unless it can state good reasons for not doing so. *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 945 (7th Cir. 1997). However, a court must also determine whether the costs are allowable and reasonable both in their amount and their necessity to the litigation. *Cengr v. Fusibond Piping Systems, Inc.*, 135 F.3d 445, 454 (7th Cir. 1998).

## C. Motion for Prejudgment Interest

"The general purpose of awarding prejudgment interest is to compensate the judgment creditor for the delay caused by litigation." *In re Estate of Silsby*, 914 A.2d 703, 709 (Me. 2006). A prevailing party is presumed to be entitled to prejudgment interest. *See, e.g., Purwin v. Robertson Enterprises, Inc.*, 506 A.2d 1152, 1154 (Me. 1986). For Maine civil actions in which prejudgment interest began to accrue prior to July 1, 2003, on a judgment in excess of $30,000, the rate of interest is the one-year United States Treasury bill rate plus 1%. 14 Me. Rev. Stat. § 1602-B ¶ 7(B). Despite the presumption in favor of an award of prejudgment interest, upon a showing of good cause, a court may order interest fully or partially waived. 14 Me. Rev. Stat. §1602-B ¶ 5.

## D. Motion for Attorneys' Fees

Under the so-called "American rule," a party to a lawsuit pays its own attorneys' fees absent some sort of authority to shift the burden, such as a statute, a rule of procedure, or prior agreement of the parties. Maine adheres to this rule and

the common law of that state indicates a strong disinclination to awards of attorneys'

fees. *See Maietta Const., Inc. v. Wainwright*, 847 A.2d 1169, 1176 (Me. 2004);

*Goodwin v. School Administrative Dist. No. 35*, 721 A.2d 642, 646 (Me. 1998).

Moreover, Maine courts have taken a narrow approach to interpretation of statutes

authorizing fee awards, stating that they will neither infer that fees are allowable in

the absence of an express statutory mandate or that there is a presumption in favor of

an award when a statute offers the option of a fee award. *Maietta*, 847 A.2d at 1176.

The party seeking fees has the burden of establishing an entitlement to such an award.

*See Poussard v. Commercial Credit Plan*, 479 A.2d 881, 886 (Me. 1984) (quoting

*Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S. Ct. 1933, 1941 (1983).

With all these principles in mind, we turn to the instant motions.

## DISCUSSION

### A. Volvo's Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial or Remittitur

*1. "Good Cause" Under the MFL*

Volvo argues that the jury's determination that Volvo did not have good cause

to terminate FMS was erroneous as a factual and legal matter. First, Volvo contends

that the jury's determination that Volvo did not have good cause to terminate FMS

was so unsupported by the evidence as to justify ordering judgment as a matter of law

or a new trial. Second, Volvo asserts that the jury was prejudiced by this Court's

instruction concerning the meaning of the "good cause" requirement under the MFL, such that a new trial is warranted.

a. Jury's Verdict

Volvo argues that no reasonable jury could have concluded that it did not discontinue the excavator when it made a series of safety modifications before initially rebranding the excavator. In the alternative, Volvo also argues that no reasonable jury could have concluded that Volvo did not discontinue the Samsung excavator when, in 2002, it replaced the excavator's Cummins engine with a Volvo engine.

Both Volvo and FMS presented credible, competing views of the type and import of the changes made to the Samsung excavator: while Volvo pointed to a list of every alteration it made to the excavator, regardless of how small, FMS presented evidence that the excavator was still produced at the same factory, was still largely the same design, and even with a different brand of engine, retained the same performance capabilities. Further, FMS presented evidence that Volvo's changes were cosmetic, minor, or the result of standardizing or renaming systems which had existed on the earlier Samsung versions. In short, the jury was presented with both sides' versions of the facts, and the possibility that the jury could have reached a different result is not grounds for a new trial. *Continental Air Lines, Inc. v. Wagner-Morehouse, Inc.,* 401 F.2d 213 (7th Cir. 1968). The fact that the jury chose to believe

FMS's version of the facts was neither unreasonable nor against the manifest weight of the evidence.

b. Jury Instruction

Volvo describes the Court's jury instruction with regard to the quantum of proof required to establish discontinuation of the franchise goods as "having no basis in the Seventh Circuit's mandate or the language of the MFL." The Court issued the following instruction:

> Under the Maine Act, a manufacturer such as Volvo may not terminate or refuse to continue a franchise relationship with a dealer until or unless the manufacturer has good cause for termination as of the effective date of termination. The Maine Act provides that "there is good cause when the manufacturer discontinues production or distribution of the franchise goods." Volvo's change of the colors and the brand on the excavators from Samsung to Volvo, without more, does not constitute a discontinuation of the franchise goods. The issue you must decide is whether FMS has proven by a preponderance of the evidence that, as of the effective date of the termination of its franchise relationship with FMS, Volvo had not substantially changed the excavator FMS had been buying from Volvo.

Volvo takes issue with the use of the words "franchise goods" and the explanation for the quantum of change required to constitute a "discontinuation" of those goods. First, Volvo argues that the "franchise goods" can only be defined as Samsung branded excavators.[1] In support of this argument, Volvo points to the MFL, which

---

[1]In a footnote to their memorandum in support of their motion for a new trial, Volvo objects to this Court's rulings on the issue of the identity of the "franchise goods." Arguments raised in footnotes are waived. *See U.S. v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989).

defines a franchise as an arrangement pursuant to which a manufacturer grants to a dealer or distributor of goods "a license to use a trade name, trademark, service mark or related characteristic and in which there is a community of interest in the marketing of the goods and related services." 10 Me. Rev. Stat. § 1361(3). Thus, Volvo concludes, it is a license to a trademark that defines the franchise goods and the franchise relationship under Maine law. Once Volvo discontinued the Samsung branded excavators, Volvo argues, it had good cause to terminate FMS as a dealer. By explicitly instructing that a change of brand was not enough, and by instructing instead that a product is not discontinued unless it has been substantially changed, Volvo argues that this Court so erred in instructing the jury that a new trial is warranted.[2]

First, Volvo's argument is foreclosed by the law of the case. We are bound to follow the Seventh Circuit's rulings, both explicit and implicit, as the law of the case with respect to issues that were squarely presented to that court. *Creek v. Village of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998). Volvo argued to the Seventh Circuit that, even if the Maine statute applied, it had "good cause" to terminate FMS. *Cromeens,* 349 F.3d at 389. When the Seventh Circuit remanded this matter to this Court, it did so after a discussion of the same argument Volvo proffers here. The Seventh Circuit nonetheless concluded that a question of fact existed as to whether or not there was "good cause" for termination:

---

[2]In another footnote to their memorandum in support of their motion for a new trial, Volvo objects to this Court's refusal to permit a special verdict form in which the jury might indicate when it believed the excavators were discontinued. For the reasons stated above, Volvo has waived this argument. *White*, 879 F.2d at 1513.

Volvo maintains that it had good cause to terminate or fail to renew the agreements. Volvo contends that its legitimate business objective of consolidating its distribution network satisfies the good cause standard. Volvo also contends that it made a good faith business decision to withdraw Samsung brand excavators and introduce remodeled Volvo-brand excavators, another good cause reason to terminate under the Maine law...The Samsung Dealers dispute Volvo's characterization of the withdrawal of Samsung products from the market. According to the Dealers, Volvo made modest improvements to some of the excavators and rebranded them but that the excavators essentially continued to be sold in a form covered by the Dealer Agreements. The Samsung Dealers characterize this as a unilateral decision to rebrand the product rather than a discontinuation of production or distribution of the franchise goods.

*Cromeens*, 349 F.3d at 391. After identifying the essence of the factual dispute over whether Volvo had good cause to terminate FMS, the Seventh Circuit remanded the case for trial on this issue. *Id*. By remanding the case to this Court for a determination of good cause, the Seventh Circuit implicitly rejected Volvo's argument that a change of brand name, without more, constituted good cause. *Id*. Instead, the Seventh Circuit noted that Volvo argued that its legitimate business objectives of consolidating its network or the nature of its remodeled excavators could potentially constitute good cause under the MFL or could really be a "unilateral decision to rebrand," as the dealers argued, which would not amount to a discontinuation of the product. *Id.* Accordingly, the issue of whether or not a rebranding of the excavators could *ipso facto* qualify as "good cause" for termination has already been argued, and implicitly decided, by the Seventh Circuit. The instruction to the jury reflected the essence of the Seventh Circuit's mandate and is not grounds for a new trial.

Furthermore, Volvo's argument is foreclosed by a plain reading of the statute. As a federal court sitting in diversity, we must apply the law of the forum state as articulated by that state's supreme court. *E.g., Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 876 (7th Cir. 2005). In this case, the Maine courts have not had occasion to rule on what constitutes discontinuing the production or distribution of the franchise goods under the MFL. However, Volvo's narrow interpretation of the meaning of "discontinue" would eviscerate the purpose of requiring "good cause" for termination. If a manufacturer was able to discontinue a product and terminate a franchise simply by changing the product's trademark, the manufacturer could create "good cause" at its whim. This could not be the intent of the MFL, which by its history and provisions evinces a clear intent to protect franchisees. *Cromeens,* 349 F.3d at 389.

Finally, Volvo raises several new statutory and Constitutional arguments in its post trial motion; none of these grounds were presented to the Seventh Circuit, and only one, the Lanham Act claim, was presented prior to Volvo's post-trial motion. According to Volvo, should the MFL be interpreted to require any more than a change of trademark to establish "discontinuation" and good cause, such an interpretation would violate the Commerce, Takings, and Contracts Clauses of the U.S. Constitution, as well as the Lanham Act.

In our denial of Volvo's summary judgment motion, we summarily rejected Volvo's Lanham Act claims. As Volvo has incorporated the portion of its summary judgment brief concerning the Lanham Act into its post-trial motion, we explain our reasoning for rejecting its claim in more detail. At summary judgment, Volvo

contended that interpreting the MFL's "good cause" standard to require more than simply a change of trademark to establish discontinuation of a product would transform Maine into the "intellectual property equivalent of a forced labor camp."

Volvo's argument seeks to create a slippery slope where none exists. First of all, FMS has never requested that Volvo grant it a license to operate a Volvo franchise. Regardless, Volvo asserts that our interpretation of the MFL would require it to grant FMS a Volvo franchise in order to avoid being held liable for damages as a result of termination without "good cause." Forcing Volvo to license the Volvo mark to FMS, Volvo contended, would run afoul of the Lanham Act because it would interfere with Volvo's right, pursuant to Section 45 of the Lanham Act, to control its registered trademarks. This is simply not true. In order to show discontinuation and good cause, Volvo need only show that the product bearing the Volvo mark is distinct from the Samsung branded excavator. This the jury determined Volvo did not do. Volvo's trademark denotes a brand, but mere application of the physical trademark does not create the brand; were it otherwise, "knock off" designer goods would be permissible under the Lanham Act. Volvo's interpretation of the meaning of its trademark would turn trademark law on its head. Perhaps this is why Volvo has never provided any support for its assertion that the MFL should be preempted by the Lanham Act. In fact, our independent research reveals that the seminal case addressing this issue holds that state franchise laws do not directly regulate the same subject matter as the Lanham Act and are therefore not preempted by the Act. *See Mariniello v. Shell Oil Co.,* 511 F.2d 853, 858 (3d Cir. 1975). Volvo is required by the Maine Act not to continue to produce equipment, nor to license new equipment,

but instead, should it choose to discontinue the equipment, to actually discontinue the equipment; not to simply rename it, or make some changes, and then use the change of brand name as a reason to terminate a franchise.

Unlike its Lanham Act claims, Volvo's constitutional claims have not been raised in any argument before this Court or the Seventh Circuit during the seven years this case has been pending. By waiting to raise advance these arguments until its post-trial motion, Volvo has forfeited its rights to raise them. *E.g., Harper v. Albert,* 400 F.3d 1052, 1062-63 (7th Cir. 2005) (legal theories not appearing in the pretrial order may not be raised after verdict). Principles underlying the grant or denial of post-trial motions further support a finding of forfeiture. Courts may not grant judgment as a matter of law on an issue not raised in a pre-verdict motion. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004). Motions for a new trial are not designed to permit litigants to re-argue the case under new legal theories. *Fort Howard Paper Co. v. Standard Havens, Inc.,* 901 F.2d 1373, 1380 n.4 (7th Cir. 1990). For these reasons, Volvo has forfeited their constitutional claims.

Even if Volvo had not waived its new arguments by failing to present them prior to its post-trial briefing, its arguments are abstract hypotheticals with little relevance to the facts of the case as presented at trial. Volvo asserts that this Court has construed the MFL to be a "commercial speed trap" or an "exit toll" inconsistent with the Commerce Clause, because it penalizes franchisors who choose to withdraw products from the market. However, the cases and arguments proffered by Volvo in support of their constitutional claims all concern situations in which the franchisor made a non-discriminatory withdrawal from the market - a situation the jury

determined did not exist here. Volvo relies principally on *Central GMC, Inc. v. Gen. Motors Corp.*, 946 F.2d 327 (4th Cir. 1991), in which the Fourth Circuit noted that damage awards that made the cost of exiting markets prohibitive could violate the Commerce Clause. Central to the Fourth Circuit's conclusion was the idea that GMC had made a non-discriminatory withdrawal from the market in response to changed conditions - a business decision which the Fourth Circuit said was permissible under Maryland franchise law. *Id.* at 333-34. The other cases cited by Volvo are equally inapposite. In *Morley-Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373 (7th Cir. 1998), the Seventh Circuit held that a remand was proper to determine whether or not Zenith had good cause to terminate the franchise - specifically, in order for Zenith to establish that there was a legitimate business need for its action and that it acted in a non-discriminatory manner. In *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 60 (1st Cir. 1992), a case which involved bad faith, rather than termination, under the MFL, the court specifically determined that Honda's market withdrawal was not in bad faith and was non-discriminatory.

In this case, the Seventh Circuit ordered that the issue of good cause was to be submitted to the jury. The jury heard evidence that included testimony that Volvo had not in fact withdrawn from the market, but instead terminated some, but not all dealers; that it continued to sell essentially the same excavator, but under a different name; and that any purported changes were minor in effect. In this case, evidence was presented from which a reasonable jury could conclude that Volvo had not in fact made a non-discriminatory market withdrawal, and as discussed in the previous section, this court will not overturn the jury's verdict on this issue.

*2. Testimony of Frederic Lieber*

Volvo argues that the admission of FMS's damages expert, Frederic Lieber, was in error. Although Volvo does not contest Lieber's expert qualifications or the appropriateness of a "lost profits" damage analysis, it contends that Lieber's testimony should have been excluded under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or under Maine law because the evidence supporting the award of lost profits was speculative and unreliable.

a. Exclusion of Lieber's Testimony under *Daubert*

Volvo contends that a new trial should be granted because Lieber's testimony did not satisfy the *Daubert* standard. As an initial matter, Volvo has waived this argument because it did not raise it until both sides had rested their case. Volvo offers no explanation for its delay in objecting to Lieber's testimony on *Daubert* grounds. Volvo does not contest FMS's assertion that Volvo was provided with Lieber's first expert report in May 2004, and his amended report in February 2005. In presenting its own expert, Randy Whitt, to criticize the foundations of Lieber's analysis, Volvo's counsel pointed to the list of assumptions contained in Lieber's report. Clearly, Volvo was aware of the nature and substance of Lieber's testimony well before trial.

It is an elementary rule of evidence, codified at Fed. R. Evid. 103, that a party must object to evidence at the time that it is offered, or run the risk of waiving the objection entirely. Our determination that Volvo has waived its objection to Lieber's testimony is dictated by *Naeem v. McKesson Drug Co.*, 444 F.3d 593 (7th Cir. 2006). In *Naeem*, defendants objected to an expert's opinion on one ground at trial. On their

renewed motion for judgment as a matter of law or, alternatively a new trial, they raised another, separate ground for exclusion of the expert. The Seventh Circuit held that defendants had waived their second objection to the expert's testimony because they had not raised it during the testimony or in a motion in limine. *Id.* (holding that the waiver applies to a motion for new trial and on appeal). The rule cannot be otherwise. Raising *Daubert* objections to expert testimony after the close of all the evidence harms the truth-seeking function of the court in two ways: first, it smacks of "sandbagging," and second, it both deprives the Court of an opportunity to conduct a meaningful analysis and the opposing party the opportunity to bolster its proof. *See* 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6266; *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1087 (10th Cir. 2001) ("Daubert generally contemplates a gatekeeping function, not a 'gotcha' junction").

In support of its contention that it timely raised a *Daubert* objection, Volvo cites to *Goebel v. Denver & Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000), in which the Tenth Circuit held that a trial court may hold a *Daubert* hearing when asked to rule on the issue a post-trial motion. In *Goebel*, however, the *Daubert* issue had already been raised in a prior motion *in limine* and a trial objection, and the trial court had not made any findings on the issue before denying the motion and objection in summary fashion. *Goebel,* 215 F.3d at 1087; *see also Mascenti v. Becker*, 237 F.3d 1223, 1233 (10th Cir. 2001) (explaining that *Daubert/Kumho* does not override the obligation of a party to raise a timely objection to the evidence).

Volvo chose not to raise the *Daubert* objection until both sides had rested, and now argues that this Court should have stricken Lieber's testimony on its own

initiative, because, as Volvo explains, "if ever a case called for this Court to exercise its *Daubert* gatekeeper function, this case is it." Volvo's argument begs the question as to why Volvo did not first raise the issue. To shirk its responsibility under the Federal Rules of Evidence during trial and then to attempt to place the blame on this Court in a post-trial motion is not an acceptable litigation strategy. By the time both sides had rested their cases, it was entirely too late for this Court to conduct a proper *Daubert* analysis. Instead, we held that although the basis for some of Lieber's assumptions was the opinion of Ouellette, the business owner, and could be questionable under a *Daubert* standard, not all of Lieber's testimony was questionable. Furthermore, by waiting to raise the issue until the end of trial, we noted that to try to properly instruct the jury on this issue would be impossible, since the testimony had been given, and cross-examined, and Volvo had been able to present their own expert to contradict Lieber's analysis. To attempt to strike the testimony at that date would be, we explained, "a jigsaw puzzle" that could not be put back together for the jury in any "meaningful comprehensive or comprehensible way." Accordingly, we had no choice but to deny Volvo's motion to strike, and for the same reasons, we decline to order a new trial based upon the alleged deficiencies in Lieber's testimony.

   b.  Lieber's Lost Profits Analysis

Volvo describes Lieber's methodology as speculative and unreliable, and argues that it should be stricken as impermissible under Maine law, or at the very least, reduced by striking Lieber's "terminal value" calculation.

The proper amount of damages in this diversity case is determined by Maine law. *Naeem*, 444 F.3d at 611 (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 431 (1996)). In Maine, damages need not be proved to a mathematical certainty. *Tang of the Sea, Inc. v. Bayley's Quality Seafoods, Inc.* 721 A.2d 648, 650 -51 (Me. 1998). Instead, lost profits may be recovered if those profits can be estimated with reasonable certainty, *Eckenrode v. Heritage Mgmt. Corp.*, 480 A.2d 759, 765 (Me. 1984), such that the estimate of lost profits is "an informed opinion based on facts that the fact-finder can evaluate." *Rutland v. Mullen*, 798 A.2d 1104, 1112 (Me. 2002). It is a well established principle that the defendant bears the risk of uncertainty in the calculation of the damages proven to result from defendant's wrongful conduct. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (U.S. 1931) (holding that "the rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."); *Dillingham v. Ryan*, 651 A.2d 833, 837 (Me. 1994).

Maine courts have dismissed as speculative lost profit estimates that are based solely on the business owner's testimony without corroborating evidence. *Reardon v. Lovely Development, Inc.*, 852 A.2d 66, 70 (Me. 2004). Accordingly, Maine courts have stricken the following as estimates of lost profits as speculation: where evidence of lost profits was based only upon the plaintiff's own opinion and one year's past performance as reflected on his income tax statements, *Eckenrode*, 480 A.2d at 766; where the business owner made only a bare guess as to his future earnings, *Ginn v. Penobscot Co.*, 334 A.2d 874, 887 (Me. 1974); and where the estimate of lost profits

consisted of the business owner's speculation combined with general information from real estate agents, *Jutland*, 798 A.2d at 1112-13.   However, where expert or statistical information corroborates the business owner's testimony, Maine courts have concluded that such testimony is not speculative.  *See Wood v. Bell*, 902 A.2d 843, 851 (Me. 2006) (crediting owner's testimony when supported by expert evidence of value); *Marquis v. Farm Family Mut. Ins. Co*., 628 A.2d 644, 650 (Me. 1993) (owner's assertions of lost profits corroborated by government statistics analyzed by the State Potato Specialist of the University of Maine).

As a starting point for his analysis of lost profits, Lieber used FMS's historical business records to establish the profits FMS made on sales of excavators prior to termination; although he did not use the precise financial information contained on FMS's income tax statements, he provided reasons for each step of his analysis of what he contended was a true picture of FMS's profitability, rather than one that was dependent on FMS's corporate tax status.  Furthermore, Lieber explained his reasons for taking an average of FMS's profits over the five years it operated a Samsung franchise, rather than for choosing to use only the final year of operation as a baseline for his lost profits analysis.  In order to establish a rate of growth in the franchise, Lieber relied upon the opinion of FMS's owner, Ouellette, who has considerable expertise in the industry, as well as statistical information concerning the number of sales of excavators made nationally and in the territory in which FMS operated. Lieber assumed that FMS, which had sold, generally, 4-5 excavators per year, would sell an additional excavator each year for five years.  At the five-year mark, Lieber asserted that a year-to-year lost profits analysis was no longer reliable, and performed

a terminal value analysis, in which he assumed a 4% growth rate in the company's profits. In total, Lieber estimated that the lost profits from the Samsung franchise would be approximately $2 million.

Volvo first takes issue with the types of historical financial information used by Lieber, but it cannot show that the use of historical financials is itself an inappropriate methodology. Even the cases cited by Volvo to rebut FMS's argument reveal that courts are willing to entertain lost profit calculations based upon historical data from franchise operations, even when those calculations also included the business owner's assumptions, and sometimes, when the business had not yet begun operation. *See America's Favorite Chicken Co.* 929 S.W.2d 617 (Tex. App. Ct. 1996); *Lee v. Seagram & Sons*, 552 F.2d 447 (2d Cir. 1977); *Kirkland & Co. of Anniston*, 579 So.2d 1287 (Ala. 1991).

Volvo also argues that Lieber's calculation of lost profits and a terminal value for the franchise were speculative. Volvo's argument appears to be that calculations of any lost profits beyond five years is *ipso facto* unreliable, although Volvo proffers no legal authority for that conclusion. We can find no basis for holding that recovery of lost profits is limited to a five year mark without regard to the potential life of the contract at issue. In this case, the contract was without a termination date. Finally, the "terminal value" analysis employed by Lieber are also accepted methodologies in the courts. *Matrix Group Limited, Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 593-94 (8th Cir. 2007) (approving of use of terminal valuation in connection with discounted cash flow analysis).

Lieber used accepted methodology, and supported FMS's owner's testimony with historical financial information and industry projections. While Volvo may disagree with the choices Lieber made in his analysis, Lieber's analysis is not speculative or conjectural such that Volvo could not challenge the basis for his opinions by cross-examination and the presentation of competing theories. Lieber justified each step of his analysis, and the jury chose to credit Lieber's analysis rather than Whitt's criticisms. While Lieber's damage claims are certainly high, we cannot say that they are so monstrously excessive or lack any rational connection to the evidence such as would justify a new trial or remittitur.

Finally, Volvo made the decision not to present the jury with an alternate method of calculating damages for lost profits resulting from the sale of the excavators with attachments. *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1342 (7th Cir. 1988). In *Empire Gas*, the Seventh Circuit noted that where defendants did not present their own damage estimate, the jury could not determine how to adjust the damage amount. The court declined to overturn the verdict, noting that defendants "may have feared that if it put in its own estimate of damages the jury would be irresistibly attracted to that figure as a compromise. But if so, [defendants] gambled double or nothing, as it were; and we will not relieve it of the consequences of its risky strategy." *Id.* Volvo focused its cross-examination of Lieber and its own expert's presentation largely upon a calculation of damages from the sale of excavators without attachments. While Volvo presented testimony critical of Lieber's assumptions, it did not provide the jury with an alternate means of calculating the damages suffered by FMS. These were choices made at Volvo's own risk, and this

court will not overturn the jury's determination of damages simply because Lieber's work might have been discredited under a different strategy. *See also To-Am Equipment Company, Inc. v. Mitsubishi Caterpillar Forklift America, Inc.*, 953 F. Supp. 987, 997 (N.D. Ill. 1997) (where defendant did not adequately explore the questionable details supporting expert's assumptions, "it is not the proper function of the court to cut down the victor's damages because of beliefs about whether another strategy was available.")

Finally, Volvo points the fact that the jury's verdict was almost exactly the amount of damages calculated by Lieber as an indication that the jury accepted Lieber's testimony "hook, line, and sinker" and thus the jury verdict cannot stand. As discussed above, the jury's verdict was not without rational connection to the evidence or so monstrously excessive that we must overturn the verdict. We cannot reach behind a jury's verdict to determine its reasoning, and we decline to do so. For the reasons discussed below with respect to prejudgment interest, we do not agree that the jury adopted Lieber's calculation.

3. *Damages Attributable to Sales of the Attachments*

Volvo argues that FMS should not have been permitted to recover damages for all of the profit made in the sale of the excavator, because 50% of the cost of the excavator was attributable to the forestry-specific attachments, which neither FMS nor Volvo manufactured, added by FMS prior to the sale. Evidence put forth at trial demonstrated that the excavators were sold with attachments specially designed for use in the forestry industry, and that without those attachments, the excavators would have been useless to FMS's customers. The Maine Act permits recovery of damages

"arising from" the unlawful termination of the franchise. 10 Me. Rev. Stat. § 1362. This Court held that the statute's language did not limit damages to those directly attributable to the sale of the product itself. Further, Maine law permits recovery of lost profits or special damages from items which were within the contemplation of the parties at the time of the contract. *Williams v. Ubaldo*, 670 A.2d 913, 918 (Me. 1996) (citing *Hadley v. Baxendale*, 9 Exch. Rep. 341) (1854). Accordingly, we concluded that the question of whether lost profits attributable to sales of the attachments constituted damages "arising from" termination was a question for the jury, and permitted the use of a special verdict form. The jury was presented with evidence that the franchise was valuable to FMS precisely because of these attachments, and that both Volvo and Samsung were aware of why the excavators were being purchased and the use to which they were put. The jury's determination that damages should be awarded for the lost profits resulting from the sale of the attachments was not against the manifest weight of the evidence, nor contrary to Maine law.

## B. FMS's Motions

### 1. Motion for Taxable Costs

FMS has requested that it be awarded $23,948.48 in costs incurred from items such as court reporter fees, docket fees, and document reproduction. Most of the requested costs are both allowable and reasonable, and they will be awarded. 28 U.S.C. § 1920. However, some of the charges listed are not necessary to the litigation. Specifically, FMS requests reimbursement for the videotaping of a deposition, despite also obtaining a transcript of the same. It also includes costs for transferring the contents of VHS tapes onto DVDs. It is not necessary to have

multiple records of what transpired at a deposition, and because we have allowed the cost for the transcript, we will disallow the cost of the videotaping and transfer to DVD. Accordingly, the allowable taxable costs total $23,082.08. Volvo is ordered to pay that amount to FMS.

*2. Motion for Prejudgment Interest*

As stated earlier, FMS was awarded $2.1 million in damages. Aside from the jury's indication that 50% of this amount was awarded to compensate FMS for lost profits from excavator attachments, there is no indication of the method that the jury used to reach this figure. In its motion for prejudgment interest, FMS notes that this figure is near the amount Lieber offered in his testimony as the measure of damage FMS experienced as a result of Volvo's actions. From this similarity, FMS assumes that the jury simply adopted Lieber's figure as their own.

Lieber arrived at the final figure by first calculating lost profits and terminal value as described earlier. He then adjusted those amounts for present value by applying a 5% interest rate, yielding the final total of $2.078 million. 11/27/06 Tr., p. 506, ll. 12-19; p. 510, ll. 15-21. Lieber stated that he used the 5% rate because he had been "advised by counsel that lost income is subject to earning interest at the rate of 5 percent per year from the date of loss to the date of trial." 11/27/06 Tr., p. 506, ll. 12-15. The adjustment percentage Lieber used is less than the prejudgment interest rate of 6.95% that would be applicable under Maine law to the verdict in this case. 14 Me. Rev. Stat. § 1602-B, ¶ 7(B).

FMS acknowledges that Lieber's final number already includes an interest component. However, they argue that because Lieber used a lower number than the

statutorily derived rate, we should deduct the amount he included for interest and then recalculate the interest using the 6.95% rate. They make this request despite the fact that the jury already awarded them an amount in excess of the highest figure offered by their expert. According to FMS's calculations using the higher rate, compounding the interest, and including an amount for the time between the date of the verdict and the date of this ruling, the correct amount of prejudgment interest is approximately $205,000, over twice the amount Lieber included.

The method FMS proposes is derived from an Eighth Circuit case wherein Lieber apparently caused the same problem FMS faces in this case by including interest in the damage figure offered in his expert testimony. *Minnesota Supply Co. v. Raymond Corp.*, 472 F.3d 524, 543 (8th Cir. 2006). The Eighth Circuit adjusted the amount of the verdict after employing the mechanism FMS now wishes us to use but noted that it was able to do so only because the jury had simply adopted the exact figures Lieber set forth in his testimony. In so doing, the court relied upon an earlier Eighth Circuit case that stated, "[w]hen it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there, district courts possess the power to reduce the amount of the verdict accordingly." *Id.* at 544 n.12 (quoting *C.L. Maddox, Inc. v. Benham Group, Inc.*, 88 F.3d 592, 603 (8th Cir. 1996)).

Here, the amount of the jury's verdict does not match the figure Lieber offered and thus it is impossible for us to determine exactly how they arrived at the $2.1 million figure. Consequently, we cannot unpack its components as was done in *Minnesota Supply*. This situation is solely of FMS's making; it made a strategic decision to instruct Lieber to adjust his damage calculations to present value using

an interest rate that was lower than that yielded by the applicable statute. We do not endorse the practice that FMS employed, which improperly puts a question of law to the jury and renders any undoing of its action exceedingly difficult in most circumstances. That being said, FMS could have avoided this problem by simply calculating the correct rate for Lieber. All of the components of the statutory formula were available to FMS at the time that Lieber did his original calculations. Because this situation is of FMS's making, we find that this case contains good cause for a partial waiver of prejudgment interest as allowed by the Maine statute. 14 Me. Rev. Stat. § 1602-B ¶ 5. The amount of interest already contained in the jury's verdict is both more than Lieber had included and sufficient to compensate FMS for the delay caused by the litigation. *Silsby*, 914 A.2d at 709. Consequently, FMS's motion for a recalculated amount of prejudgment interest is denied.

## 3. *Motion for Attorneys' Fees*

FMS's third and final motion seeks an award of the fees and nontaxable costs it has incurred since the Seventh Circuit remanded the case in November 2003. According to FMS, it is entitled to such an award because § 1370 of the MFL states that a violation of the MFL constitutes an unfair trade practice under the Maine Unfair Trade Practices Act ("MUTPA"). 5 Me. Rev. Stat. § 205-A et seq. Section 213(2) of MUTPA establishes that parties prevailing on a claim commenced under that statute shall be awarded reasonable attorneys' fees as well as costs. Volvo

challenges FMS's argument that § 1370 allows a party who prevails on an MFL claim to obtain MUTPA remedies without having to bring a separate MUTPA claim.[3]

Neither party has supplied, nor has our research revealed, any case addressing a situation wherein a party brought a claim under the MFL but not the MUTPA. FMS claims that the Maine Supreme Court has addressed this situation with the Home Construction Contracts Act ("HCCA"), another Maine statute that provides that any violation of that statute is also a violation of MUTPA. *Van Voorhees v. Dodge*, 679 A.2d 1077 (Me. 1996); *Mushero, Inc. v. Hull*, 667 A.2d 853 (Me. 1995). According to FMS, in both these cases, the Maine Supreme Court upheld awards of attorneys' fees to parties who prevailed under the HCCA in cases that did not include separate UTPA claims. However, the cases clearly indicate to the contrary. The court in *VanVoorhees* could not have been clearer that the plaintiffs prosecuted claims under both statutes: "The VanVoorhees filed a seven-count complaint against Dodge alleging, inter alia, breach of contract and violation of the UTPA." 679 A.2d at 1080. The opinion in *Mushero* unequivocally refers to the apportionment of fees Hull incurred in pursuing his UTPA claim from those for his HCCA claim, indicating that Hull sought relief under both statutes, not just the HCCA. 667 A.2d at 855. As a result, we do not accept the proposition that the Maine Supreme Court has endorsed the idea that MUTPA remedies are available to plaintiffs who seek relief under a statute that refers to MUTPA but not under MUTPA itself.

---

[3]FMS contends that it is entitled to attorneys' fees under MUTPA because it "commenced an action" under that statute by making a brief allusion to it in ¶ 110 of its complaint. Even the most cursory review of the lengthy and involved proceedings in this case reveals that FMS did not pursue a claim under MUTPA. Thus, this case cannot be characterized as one brought under both the MFL and the MUTPA.

FMS also contends that the language of § 1370 supports its claim. Again, Maine case law contradicts the position FMS advances. The Maine Supreme Court has specifically stated that "a statutory right to recover attorneys' fees will be found only in the clearest kind of legislative language." *Vance v. Speakman*, 409 A.2d 1307, 1311 (Me. 1979). It cannot be "implied from legislative intent and [it] must be articulated in unmistakable terms." *Goodwin v. School Administrative Dist. No. 35*, 721 A.2d 642, 646 (Me. 1998). To read in a provision for a remedy as significant as an award of attorneys' fees into a statute that does not clearly provide for it would do violence to these clearly established legal principles. We decline to employ such a back-door approach to statutory interpretation.

## CONCLUSION

Based on the foregoing, Volvo's motion is denied. FMS's motions for prejudgment interest and attorneys' fees are denied. Its motion for taxable costs is granted in part and denied in part; Volvo is ordered to reimburse FMS $23,082.08 in costs.

Charles P. Kocoras
United States District Judge

Dated:  March 20, 2007